IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| VOLKSWAGEN GROUP OF AMERICA, INC.; and VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. _____ |
| v. | ) ) | |
| HEMATITE, INC.; PAVACO PLASTICS, INC.; THE WOODBRIDGE GROUP; and ADVANCED INTERIOR SOLUTIONS, INC., | ) ) ) ) ) | |
| Defendant. | | |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Volkswagen Group of America, Inc. ("VWGOA") and Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga") (collectively, "Volkswagen"), by and through counsel, and for their Complaint against the Defendants Hematite, Inc. ("Hematite"), Pavaco Plastics, Inc. ("Pavaco Plastics"), The Woodbridge Group ("Woodbridge"), and Advanced Interior Solutions, Inc. ("AIS") (collectively, "the Hematite parties") hereby state as follows:

## PARTIES, JURISDICTION AND VENUE

1. VWGOA is a privately held corporation incorporated in New Jersey and with a principal place of business in Herndon, Virginia.

2. VW Chattanooga is Tennessee limited liability company. The sole member of VW Chattanooga is VWGOA. Accordingly, VW Chattanooga is a citizen of both New Jersey and Virginia.

3. Hematite is, upon information and belief, an Ohio corporation with a principal place of business in Springboro, Ohio.

4. Pavaco Plastics is, upon information and belief, a Canadian corporation with a principal place of business in Guelph, Ontario.

5. Woodbridge is, upon information and belief, a Canadian corporation with a principal place of business in Mississauga, Ontario.

6. AIS is, upon information and belief, an Ohio corporation with a principal place of business in Springboro, Ohio.

7. Venue and jurisdiction are proper in this District because the Hematite parties have anticipatorily repudiated a contract that provides for the United States District Court for the Eastern District of Tennessee as the exclusive venue and jurisdiction of any action seeking equitable relief.

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because: (1) there is complete diversity between VWGOA and VW Chattanooga and Hematite, Pavaco Plastics, Woodbridge, and AIS; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

## STATEMENT OF FACTS

**A. The Parties and the Agreements**

9. Volkswagen, as buyer, and the Hematite parties, as supplier, are parties to three Nomination Agreements and a Nomination Letter for the supply of wheelhouse liners and heat shields, which are automotive component parts. The Nomination Agreements are dated December 18, 2014, August 1, 2017, and November 3, 2017, are referred to collectively as the "Nomination Agreements," and are attached as **Exhibits A, B, and C**, respectively. The

Nomination Letter is dated June 6, 2016, and is attached as **Exhibit D** (the "June 6, 2016 Nomination Letter").

10. The December 18, 2014 Nomination Agreement is between Volkswagen Group of America, Inc. Chattanooga Operations, LLC,[1] and Pavaco Plastics and is a contract for the production of wheel housing liners.

11. The August 1, 2017 Nomination Agreement is between Volkswagen Group of America, Inc. Chattanooga Operations, LLC, and Pavaco Plastics and is a contract for the production of heat shields.

12. The November 3, 2017 Nomination Agreement is between Volkswagen Group of America, Inc. Chattanooga Operations, LLC, and Pavaco Plastics and is a contract for the production of wheelhouse liners. Production of wheel housing liners under the December 18, 2014 Nomination Agreement has been consolidated with the November 3, 2017 Nomination Agreement. The Hematite parties now manufacture all wheelhouse liners under the November 3, 2017 Nomination Agreement.

13. Under the June 6, 2016 Nomination Letter, AIS agreed to manufacture heat shields for Volkswagen Group of America, Inc. Chattanooga Operations, LLC.

14. Upon information and belief, Pavaco Plastics was amalgamated[2] with Hematite Manufacturing, Inc., in or around March 2020. Upon information and belief, Hematite Manufacturing, Inc. is affiliated with Hematite.

15. Upon information and belief, Woodbridge acquired Hematite in or around December 2020.

---

[1] VWGOA and VW Chattanooga are separate entities. The name "Volkswagen Group of America, Inc. Chattanooga Operations, LLC" appears to be a misnomer in the Nomination Agreements. To avoid any confusion, Volkswagen has brought this suit in the names of both entities.
[2] An amalgamation under Canadian law is similar to a corporate merger. *See, e.g.*, *Moroccanoil, Inc. v. Conforti*, 2021 WL 2310092, at *7 n.5 (D.N.J. June 4, 2021).

16. AIS is Hematite's sub-contractor that manufactures parts for Volkswagen.

17. The November 3, 2017 Nomination Agreement incorporates by reference the Volkswagen Group of America Chattanooga Operations, LLC's Production Terms and Conditions of Purchase (the "2017 Terms and Conditions"), which are attached as **Exhibit E**. (Ex. E, November 3, 2017 Nomination Agreement at 2).

18. The December 18, 2014 and August 1, 2017 Nomination Agreements also incorporate by reference an older version of Volkswagen Group of America Chattanooga Operations, LLC's Production Terms and Conditions of Purchase, which are attached as **Exhibit F** (the "2008 Terms and Conditions"). The 2008 Terms and Conditions state that VW Chattanooga "may modify the purchase order terms and conditions from time to time by providing revised purchase order terms to Seller or posting revised purchase order terms and conditions to Buyer's internet website . . . as specified on the face of this Order ("Buyer's Website") as www.vwgroupsupply.com prior to the date when any modified terms and conditions become effective. (Ex. F, 2008 Terms and Conditions § 38).

19. Volkswagen published the 2017 Terms and Conditions on the www.vwgroupsupply.com website. Because VW Chattanooga complied with Section 38 of the 2008 Terms and Conditions, the 2017 Terms and Conditions govern the Nomination Agreements at issue in this case.

20. The June 6, 2016 Nomination Letter states that it is "governed by the standard Production Terms & Conditions which are located on www.VWGroupSupply.com." (Ex. D, June 6, 2016 Nomination Letter). The 2017 Terms and Conditions are the current Terms & Conditions located on Volkswagen's website.

21. Collectively, the Nomination Agreements, the June 6, 2016 Nomination Letter, and the 2017 Terms and Conditions are referred to as the "Agreements."

**B.     Relevant Terms under the Agreements**

22. The Hematite parties supply Volkswagen with heat shields and wheelhouse liners for use in assembly of the Volkswagen Atlas and Volkswagen Atlas Coupe. Pursuant to the Nomination Agreements, the Hematite parties' obligations include the manufacture and delivery of heat shields and wheelhouse liners "as required" by Volkswagen. (Ex. B, August 1, 2017 Nomination Agreement at 1; Ex. C, November 3, 2017 Nomination Agreement at 1).

23. Under Section 5 of the 2017 Terms and Conditions, the Hematite parties have agreed that:

> "[P]rices are not subject to increase, unless specifically stated in the Order, the RFQ Documents or a Prior Agreement, and Seller assumes the risk of any event or cause affecting prices, including without limitation, . . . increases in raw material costs, inflation, increases in labor and other production and supply costs, and any other event which impacts the price or availability of materials or supplies."

(Ex. E, 2017 Terms and Conditions § 5).

24. The 2017 Terms and Conditions also state that "Seller may not suspend performance of the Order or terminate the Order for any reason." (Ex. E, 2017 Terms and Conditions § 20).

25. The Hematite parties have also agreed that "time and quantity are of the essence to Volkswagen." (Ex. B, August 1, 2017 Nomination Agreement ¶ 6.4; Ex. C, November 3, 2017 Nomination Agreement ¶ 6.4).

26. The 2017 Terms and Conditions also provide that "either party may, with respect to a Claim, apply to a court for equitable relief, including a temporary restraining order, preliminary injunction or other interlocutory or relief[.]" (Ex. E, 2017 Terms and Conditions §

38.1(f)). The 2017 Terms and Conditions further provide that "[a]ny court relief sought under this Section shall be brought in and subject to the exclusive venue and jurisdiction of the courts of Hamilton County, Tennessee or the U.S. District Court for the Eastern District of Tennessee, as applicable[.]" (*Id.*)

27. Recognizing the nature of the automotive industry and the need for timely deliveries and uninterrupted supply, and the fact that Volkswagen does not manufacture these specially-made Parts, Volkswagen and the Hematite parties have also agreed that money damages would be an inadequate remedy to Volkswagen if deliveries by the Hematite parties are not made as required. Section 15 of the 2017 Terms and Conditions provides:

> In any action brought by Buyer to enforce Seller's obligations in connection with the production or delivery of Supplies or transition support . . . Seller acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of the Order and that, in addition to all other rights and remedies that Buyer may have, Buyer shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus Buyer's reasonable attorneys' fees.

(Ex. E, 2017 Terms and Conditions § 15).

**C.    The Hematite Parties' Anticipatory Repudiation of the Agreements**

28. On or about April 22, 2021, the Hematite parties first requested a price increase with respect to the Parts. Volkswagen replied on or about May 6, 2021, reminding the Hematite parties that the parties' Agreements did not permit the Hematite parties to demand a price increase. *See* April 22 – May 6, 2021 email correspondence attached as **Exhibit G**.

29. On or about July 1, 2021, the Hematite parties informed Volkswagen that beginning on August 1, 2021, unless Volkswagen issued a price increase with respect to the Parts, the Hematite parties would no longer ship the contracted-for Parts to Volkswagen. *See* July 1, 2021 email attached as **Exhibit H**.

30. Upon being made aware of the Hematite parties' attempts to extort a price increase from Volkswagen and to unilaterally alter the contract terms on Volkswagen production parts, on July 6, 2021, John Critchfield, Corporate Counsel for Volkswagen, wrote to both AIS and Hematite, reminding AIS and Hematite of their obligations under the Agreements and demanding adequate assurances that AIS and Hematite would continue production and shipment pursuant to the parties' Agreements. Copies of both July 6, 2021 letters are attached as **Exhibits I and J**.

31. On July 13, 2021, Tim Miller, Account Manager for Hematite, responded by letter to Volkswagen, demanding a "new level of pricing," stating that Hematite would "transition this business to VW's supplier of choice in the next 90 days" if Volkswagen would not accept this price, and asking Volkswagen to evaluate and communicate which "option" Volkswagen would prefer prior to August 1, 2021. Mr. Miller also indicated that Hematite was not raising with Volkswagen any issues relating to force majeure.[3] A copy of Mr. Miller's July 13, 2021 letter is attached as **Exhibit K**.

32. On July 23, 2021, Mr. Miller requested a meeting with Monica Ramirez-Galvez, Volkswagen's Interior Buying Analyst, and Ms. Ramirez-Galvez's supervisor, Joel Karlsberg, to discuss the pricing issue. Ms. Galvez scheduled a call for August 5, 2021. A copy of the email correspondence reflecting the scheduling of this meeting is attached as **Exhibit L**.

33. On or about August 5, 2021, Mr. Karlsberg and Ms. Ramirez-Galvez had a call with Mr. Miller and Paul Lawrence from Hematite. During this call, Mr. Karlsberg and Ms.

---

[3] Even if the Hematite parties were claiming force majeure, that would be no basis to demand a price increase. Under Section 23 of the 2017 Terms and Conditions, "The change in cost or availability of materials or components based on market conditions, supplier actions, or contract disputes or any labor strike or other labor disruption applicable to Seller or any of its subcontractors or suppliers, will not excuse Seller's performance (under theories of force majeure, commercial impracticability or otherwise), and Seller assumes these risks." See Ex. E, 2017 Terms and Conditions § 23.

Ramirez-Galvez made clear that the parties were bound by a contract, that the Hematite parties must perform under the contract, and that the Hematite parties were not entitled to demand a price increase.

34. On August 6, 2021, Mr. Miller emailed Ms. Ramirez-Galvez, continuing to demand a price increase on behalf of the Hematite parties, and threatening to stop shipping on November 1, 2021. A copy of Ms. Ramirez-Galvez's and Mr. Miller's August 5-27, 2021 email correspondence is attached as **Exhibit M** ("Ex. M, August 5-27, 2021 email correspondence").

35. Ms. Ramirez-Galvez visited the Hematite parties' facility on August 26, 2021. At this meeting, the Hematite parties once again restated that they would stop shipments if Volkswagen would not accept the Hematite parties' demand for a price increase.

36. On September 20, 2021, the Hematite parties submitted a new offer to Volkswagen's Global Sourcing system containing a price increase not only for raw material but for an increased labor rate, as well.

37. On or about October 7, 2021, the Hematite parties sent an invoice reflecting the increased prices requested. A copy of the email with invoice is attached as **Exhibit N**.

**D.     The Hematite Parties' Anticipatory Repudiation Requires Injunctive Relief.**

38. The Hematite parties' threatened refusal to ship Parts requires injunctive relief. Volkswagen's supply chain requires timely delivery of all component parts, otherwise the entire supply chain shuts down, stopping assembly at Volkswagen. Volkswagen requires a timely delivery model, which is standard in the automotive industry and means that Volkswagen does not have a sufficient inventory of excess parts.

39. The heat shields and wheelhouse liners the Hematite parties manufacture are unique component, automotive parts that must meet demanding engineering specifications and

require extensive certification and validation for production, and the sole source of supply of these products is the Hematite parties. Volkswagen cannot readily obtain replacement parts from another supplier, or manufacture them internally. The Hematite parties are aware Volkswagen has no ready replacement source of supply for these products.

40. Any delay in the delivery of these Parts, delivery of less than the requirement, or stoppage in delivery of the same can lead to a shutdown of Volkswagen's assembly process.

41. The Hematite parties are aware that abruptly stopping deliveries will cause catastrophic harm to Volkswagen.

42. Such catastrophic harm will include, but is not limited to, Volkswagen stopping assembly of vehicles related to the Parts, delaying the launch of Volkswagen's updated vehicles, sending up to 3,000 Volkswagen workers home without pay, and causing further unavailability of vehicles on the market during a time when vehicle supply is already a critical issue in the United States. Existing consumers of Volkswagen vehicles could also be impacted if those vehicles are in need of repairs involving the Parts the Hematite parties supply.

43. Volkswagen is left with no recourse but to seek immediate relief from this Court to avoid irreparable harm.

CAUSE OF ACTION

**COUNT 1 – BREACH OF CONTRACT/ANCITIPATORY REPUDIATION OF THE AGREEMENTS**

44. Volkswagen incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

45. Volkswagen and the Hematite parties have a valid and mutually binding contract that requires the Hematite parties to supply Volkswagen with all ordered quantities of the

wheelhouse liners and heat shield parts at the prices set forth in the parties' Agreements. The Hematite parties are bound by the obligations set forth in the Agreements.

46. Volkswagen has fulfilled all of its contractual obligations under the parties' Agreements.

47. The Hematite parties' communicated intent to cease delivery of the wheelhouse liners and heat shield parts if Volkswagen does not concede to the Hematite parties' price increase demand constitutes a breach of contract by anticipatory repudiation of the parties' Agreements.

48. The Hematite parties' failure to provide adequate assurances in response to Mr. Critchfield's July 6, 2021 letter constitutes a repudiation of the contract under Tenn. Code Ann. § 47-2-609.

49. Under the 2017 Terms and Conditions, the Hematite parties may not unilaterally increase their prices, and Volkswagen is not required to agree to a unilateral, extortive demand for a price increase. (Ex. E, 2017 Terms and Conditions § 5).

50. Under the 2017 Terms and Conditions, the Hematite parties may also not suspend performance under the contract or terminate the contract for any reason. (Ex. E, 2017 Terms and Conditions § 20).

51. If the Hematite parties do not continue to manufacture and ship the wheelhouse liners and heat shield parts, Volkswagen will be unable to fulfill its assembly obligations, which will force Volkswagen to shut down assembly lines, resulting in idle assembly operations, and potential layoffs. Volkswagen will suffer damages equal to the resulting cost associated with a shutdown, as well as damage to Volkswagen's business goodwill and reputation in the automotive industry as a whole.

52. The Hematite parties' would be responsible for monetary damages for these line shut downs caused by its breach.

53. Volkswagen has been unable to locate a competitive alternate supplier for these Parts.

54. If the Hematite parties do not perform their obligations, Volkswagen will have no adequate remedy at law for the harm caused by such breach, and the Hematite parties and Volkswagen agreed that Volkswagen would be entitled to injunctive relief in such circumstances. (Ex. E, 2017 Terms and Conditions § 15).

55. Additionally, under Tenn. Code Ann. § 47-2-716, Volkswagen is entitled to equitable relief in the form of an order for specific performance because the wheelhouse liners and heat shield parts are specially manufactured goods without readily available substitutes.

**PRAYER FOR RELIEF**

WHEREFORE, Volkswagen prays as follows:

A. For process to issue and be served on all Defendants, requiring them to answer the allegations in the Complaint;

B. For injunctive relief preventing the Hematite parties from taking any action inconsistent with its supply obligation to Volkswagen under the Agreements;

C. For an order of specific performance and/or mandatory injunction requiring the Hematite parties to continue to supply Volkswagen with the ordered quantities of the Parts under the Agreements and at the prices agreed upon in the Agreements;

D. For monetary damages suffered by Volkswagen due to any ordered Parts not shipped by the Hematite parties;

E. For an award of attorneys' fees and costs arising out of the Hematite parties' failure to performance under the Agreements; and

F. For all other relief as the Court may deem, just, equitable or appropriate under the circumstances.

Respectfully submitted,

CHAMBLISS, BAHNER & STOPHEL, P.C.


By:/s/*Timothy M. Gibbons*
    Timothy M. Gibbons, BPR# 014860
    Kelly B. Etchells, BPR# 035998
Liberty Tower
605 Chestnut Street, Suite 1700
Chattanooga, TN 37450
Telephone: (423) 756-3000
Facsimile: (423) 265-9574
Email: tgibbons@chamblisslaw.com
       ketchells@chamblisslaw.com

*Counsel for Volkswagen Group of America, Inc. and Volkswagen Group of America Chattanooga Operations, LLC*

# **VERIFICATION**

I, Joel Karlsberg, declare as follows:

I am Director of Interior Purchasing of Volkswagen Group of America Chattanooga Operations, LLC ("VW Chattanooga"). I have reviewed the foregoing Verified Complaint for Injunctive Relief and Damages. Except as to those matters alleged on information and belief, I verify that the facts set forth above are true and correct based upon my information, personal knowledge and belief, including information gathered from VW Chattanooga's and/or Volkswagen Group of America, Inc.'s documents that were prepared and maintained in the ordinary course of the company's business and/or VW Chattanooga's and/or Volkswagen Group of America, Inc.'s employees who have personal knowledge of the facts asserted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 19th day of October, 2021, at Chattanooga, Tennessee.

_____